# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

VEDA STRODER,          )
                                )
          Plaintiff,       )    **MEMORANDUM OPINION**
                                )    **AND RECOMMENDATION**
     v.                    )
                                )        1:09CV335
UNITED PARCEL SERVICE, INC.,   )
                                )
          Defendant.     )

This matter is before the court on a motion for summary judgment by Defendant United Parcel Service, Inc. ("UPS") (docket no. 20.) Plaintiff Veda Stroder has responded in opposition to the motion; therefore, the matter is ripe for disposition. The parties have not consented to the jurisdiction of the magistrate judge; therefore, the motion must be addressed by recommendation. For the following reasons, it will be recommended that the court grant Defendant's motion for summary judgment.

## BACKGROUND

In this case, Plaintiff claims that her former employer violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., as well as state law when the employer refused to allow her to take FMLA leave to care for her son. Plaintiff Veda Stroder is a former UPS employee whose employment ended after she failed to return to work following the denial of her request to take leave pursuant to the FMLA. Plaintiff claims that, by denying her leave request and subsequently deeming her to

have resigned her employment after she did not return to work, UPS interfered with her rights under the FMLA, discriminated/retaliated against her for making the request, and violated North Carolina public policy. Defendant has moved for summary judgment as to all of Plaintiff's claims.

Plaintiff Stroder

Plaintiff Stroder is a former part-time supervisor at UPS's package distribution center in Greensboro, North Carolina. (Pl.'s Dep. at 44.) Plaintiff supervised the "Customer Service Counter" and about ten employees. (*Id.* at 44, 46.) She worked a 5.5 hour shift, 8:00 a.m. to 1:30 p.m., Monday through Friday. (*Id.* at 48 & Exs. 9 & 10.)

Plaintiff's Son and His Speech Therapy

In the Spring/Summer of 2007, Plaintiff had a four-year-old son, who will be referred to here as "CS." (Pl.'s Dep. at 130.) In 2005, CS was diagnosed with a form of speech impairment and became eligible for a publically funded early intervention program that included speech therapy. (*Id.*) In 2006, CS was placed in an early childhood program funded by the Guilford County school system, which again included speech therapy. (*Id.*) As of Spring 2007, CS attended a 5-day per week, full-time daycare program, which included publicly funded speech therapy sessions twice a week, for 30 minutes each session. (*Id.* at 135, 148; Sabo Dep. at 18.)

In 2007, CS's speech therapist was Denise Sabo. (Pl.'s Dep. at 139-40.) Between February and June 2007, after each speech therapy session Sabo would leave "instructions" for Plaintiff to work with CS on various language exercises. (*Id.* at 142.) Plaintiff completed the exercises with CS in the afternoons or evenings, after her work day at UPS. (*Id.* at 142-44, 146.) Sometime in April 2007, CS was moved to a new daycare facility within the Guilford County school system.[1]

Two-Month Summer Break from Speech Therapy

On or about June 8, 2007, when the regular Guilford County school system commenced a two-month summer break, CS's speech therapy sessions with Sabo ceased until school reconvened two months later in August. (Pl.'s Dep. at 137, 147; Sabo Dep. at 14.) CS was eligible to continue in a full-time daycare program during the summer. The only difference would be that the two, weekly 30-minute speech therapy sessions would be discontinued during the summer. (Pl.'s Dep. at 137, 227-28, 229-30.)

By June 2007, Sabo began noticing "significant changes in [CS's] behavior," which were slowing his progress in speech therapy, and which Sabo attributed to the recent change in daycare facilities in April 2007. (Sabo Dep. at 30-31, 37-38.) Sabo concluded, however, that CS was "still making progress" and was "on target to master the goals [for his speech therapy]" by year end. (*Id.* at 22-23, 30-31, 38-39,

_____

[1] The parties note that CS moved to a new daycare facility because of certain "structural damage" that required the previous facility to be closed.

-3-

49.)  The impact on CS's speech development "really wasn't that significant," but "behaviorally he had changed."  (*Id.* at 49, 50-51.)  Sabo did not consider CS to qualify for the county's "extended school year," whereby he could continue to receive speech therapy in the summer.  (*Id.* at 28-29, 51.)  Sabo concluded that CS "did not have any life-critical skills that . . . needed to be addressed at that time . . . [and] he truly did not fit the criteria for extended school year."  (*Id.* at 51.)

Sabo did, however, provide Plaintiff with certain "activities for receptive and expressive language stimulation" that she could do with CS during the two-month break from his twice weekly, 30-minute therapy sessions.  (Pl.'s Dep. at 143, 159; Sabo Dep. at 51.)  The activities that Sabo suggested were not "real specific . . . but more in general," and "nothing real formal," and included reading to CS, asking him questions about the stories she read, and having him follow directions and commands.  (Sabo Dep. at 51-52, 81-82.)  Sabo provided "nothing . . . real specific" as to when, how often, or how long Plaintiff should do activities with her son.  (*Id.* at 53-55.)  There was no "specific time of day that activities had to be performed," and Plaintiff could incorporate the activities into what she was "doing with [CS] throughout the day [as] an everyday, ongoing kind of process."  (*Id.* at 53-54, 56-57.)  In addition, having CS continue in his normal daycare program during the summer would not "preclude [Plaintiff] from being able to do the activities [suggested by Sabo] over the summer."  (*Id.* at 58.)  Sabo did not make any "suggestions" or have "any input" to Plaintiff as to whether CS should be removed from the summer

-4-

daycare.  (*Id.* at 57-58.)  Sabo did testify that CS was having a "hard time in [the] daycare, and looking at his behaviors, it probably would have made it more difficult for [Plaintiff] to do things with [CS] just because the behavioral issues had emerged and were interfering with a lot of what was going on with his skill level at that time." (*Id.* at 58.)

Plaintiff's Request for FMLA Leave

In May 2007, Plaintiff spoke to her supervisor, East Greensboro Center Manager Donna Urquhart, about her son's situation and her need to have some time off to care for him "during the time that [she] would normally work."  (Pl.'s Dep. at 113-14.)  Urquhart advised that she "wasn't familiar with the whole process [for seeking FMLA leave]," but that Plaintiff should "talk to the [human resources] Department" to see if she could qualify for FMLA.  (*Id.* at 115.)  Plaintiff contacted human resources ("HR") and, consistent with UPS's FMLA procedures, was told to submit a written FMLA request, along with a "Certification Form" completed by a doctor.  (*Id.* at 115-18.)

Completion of Certification by CS's Doctor

In late May or early June, Plaintiff contacted the office of CS's pediatrician, Dr. Aveline Quinlan, to request completion of the FMLA certification form.  (Pl.'s Dep. at 125; Quinlan Dep. at 29-30.)  At the time, CS had not been seen by Dr. Quinlan in more than two years, since April 2005.  (Pl.'s Dep. at 125; Quinlan Dep. at 16-17.) Dr. Quinlan had no knowledge of CS's "progress, prognosis, [and] development" as

-5-

to his speech development issues since CS's last child "well-check" appointment at her office more than two years earlier. (Quinlan Dep. at 23, 26, 27.)

To complete the certification form, Dr. Quinlan requested input from CS's speech therapist, Sabo. (*Id.* at 35.) Dr. Quinlan was "not able to fill out the FMLA form . . . until [she] had [a letter from Sabo] that [provided an] update on [CS]." (*Id.* at 33.) On May 31, Sabo sent a letter to Dr. Quinlan outlining CS's status. (Sabo Dep. at 46 & Ex. 6; Quinlan Dep. at 23.) Sabo stated that CS had "made significant progress in his receptive language skills." (Sabo Dep. at 49; Pl.'s Dep. at 158.) Plaintiff agreed in her deposition that this was an "accurate assessment of [CS's] progress up to that date." (Pl.'s Dep. at 159.) Sabo noted that, since his recent move to a different daycare center in around April 2007, CS had "been noted to have more difficulty following directions and attending to activities in therapy." (Sabo Dep. Ex. 6.) Sabo also noted that Plaintiff had been provided with "activities for receptive and expressive language stimulation." (*Id.*)

The only information Dr. Quinlan had regarding CS's speech therapy at the time she completed the certification form was the information in Sabo's letter. (Quinlan Dep. at 25, 27; Sabo Dep. at 58-59.) Dr. Quinlan and Sabo never communicated directly about the contents of Sabo's letter or CS's status. (Quinlan Dep. at 35, 37, 39; Sabo Dep. at 46, 58-59.) Dr. Quinlan did not have "any conversations with [Plaintiff] about what she ought to do over the summer of 2007 with [CS]." (Quinlan Dep. at 44.)

-6-

Based on Sabo's letter, Dr. Quinlan concluded that CS "had made some progress" in speech development, although he might have "lost some" of that progress due to the recent change in daycare facilities. (*Id.* at 36.) As to the "activities for receptive and expressive language stimulation," Dr. Quinlan understood that Plaintiff was advised to "continue providing the [activities Sabo had recommended] . . . and try to foster continued progress with his communication skills." (*Id.* at 36-37.) In making this determination, Dr. Quinlan relied solely on Sabo's letter. (*Id.*) Dr. Quinlan did not, however, have "any sense of how much time each day this would take for [Plaintiff] to do." (*Id.* at 37.)

As the basis for the FMLA leave, Dr. Quinlan checked the block indicating that CS suffered from a "chronic condition requiring treatment." (*Id.* at 40, Ex. 5.) She indicated that "although [CS] has shown improvement with speech therapy, his speech is still significantly behind," that "the speech therapist usually provides treatments," but since the therapy was "not available in the summer," the therapist had given Plaintiff instruction to "continue treatments" herself to "continue helping him improve his expression." (*Id.*)

In completing the form, Dr. Quinlan provided "all . . . information available to [her] that would support this request." (*Id.* at 41.) The form contained the "full universe of . . . information [she] passed along in support of the request," and there was not "anything [else] . . . that wasn't included . . that also would have supported the FMLA request." (*Id.* at 41-42.) Other than delivering the certification form to Dr.

-7-

Quinlan's office, Plaintiff had no further contact with Dr. Quinlan regarding her son's condition until August 27, 2007, during a regularly scheduled "well-check." (Pl.'s Dep. at 270.)

Plaintiff's Submission of the FMLA Request and Certification Form to UPS

On June 8, 2007, Plaintiff submitted her FMLA leave request and certification to HR.[2] (Pl.'s Dep. at 165-67.) She requested leave for the entire 10-week period of "June 11 to August 31." (*Id.*) At that time, Ralph Brown was the West Carolina Occupational Health Supervisor and had authority to approve or deny FMLA requests.[3] (Brown Dep. at 21-22.) On June 11 or 12, Brown reviewed Plaintiff's FMLA request and certification form. (*Id.* at 23-26, 30, 40-41.) Brown determined that the certification form did not establish that CS's condition qualified as a "serious health condition" under the FMLA. (*Id.* at 33-34, 41, 43.) Brown concluded that the FMLA criteria were not met because (1) the form did not provide a diagnosis of a chronic condition; (2) the form did not establish that CS would have periodic visits for treatment by a qualified health care provider or by a nurse or physician's

_____

[2] While her FMLA request was pending, Plaintiff's supervisor, Urquhart, permitted her to be on vacation, use "discretionary days," or use "unpaid" days for a period starting June 8. (Pl.'s Dep. at 121-22; Urquhart Dep. at 25-26.)

[3] Brown is a Registered Nurse and Certified Occupational Health Specialist. (Brown Decl. ¶ 4.) He has received training on FMLA compliance, and he has reviewed hundreds of FMLA requests over the course of his career as an occupational health specialist for UPS and other companies. (*Id.* ¶¶ 4-5.)

assistant under the direct supervision of a healthcare provider; and (3) there was no evidence that CS was incapacitated. (*Id.* at 52, 59, 60-61, 65, 68-69.)

On June 12, Brown sent a letter to Stroder, stating that her FMLA request was denied. (*Id.* at 32-33.) Stroder received the letter on June 14. (Pl.'s Dep. at 170 & Ex. 18.) The letter stated, "UPS will expect your return to work within three business days . . . . If you do not return to work at that time, your absence will be considered unexcused." (*Id.*)

Plaintiff's Request for Reconsideration

Upon receipt of the denial, Plaintiff telephoned Brown to ask for reconsideration. (Pl.'s Dep. at 175.) Brown explained the reasons for the denial, but ultimately agreed to reconsider. (*Id.* at 176; Brown Dep. at 92.) Brown recalls that, during the call, Plaintiff described "basically the same information . . . on the [certification] form." (Brown Dep. at 95, 97.) Brown testified in his deposition that he understood that, during the summer school break, Plaintiff would need to work with CS while the normal weekly therapy was not available from his speech therapist. (*Id.* at 111-12, 114.)

Plaintiff claims that when she requested reconsideration, she told Brown that CS "had not been . . . formally diagnosed with autism, [but] was being tested and evaluated to determine [if his] symptoms . . . were consistent with autism." (Pl.'s Dep. at 177.) Brown denies that Plaintiff made this statement. (Brown Dep. at 95, 97, 109, 127.) Moreover, Plaintiff admitted in her deposition that at the time of her

-9-

FMLA request, CS was in fact not scheduled for any "test" or "evaluation" of any kind during the time period for which she was requesting FMLA leave. (Pl.'s Dep. at 179, 182, 192-93, 270.) Plaintiff testified that CS eventually had a "hearing test," but that was on one occasion in August 2007 during a regularly scheduled "well-check" and when the test failed, it was rescheduled for September 27. (*Id.* at 178, 180-81, 190, 270; *see also* Quinlan Dep. at 42-44.) Plaintiff also claims that CS was later referred to a UNC-Greensboro program for psychological assessments, but that was not until later in Fall 2007. (Pl.'s Dep. at 178, 181-82, 191.) Plaintiff further testified in her deposition that a nurse named Amanda Pone was assigned to periodically monitor CS's progress over the summer (2-3 sessions per month for 1.5 to 2 hours), but she admitted that Pone was not responsible for testing or evaluating CS or for otherwise providing medical treatment to him. (*See id.* at 178-80, 190-91, 264-65.) Moreover, Dr. Quinlan was not aware that Pone was monitoring CS's progress in Summer 2007, and she was not "overseeing" any such monitoring. (Quinlan Dep. at 51-52.) Finally, on the certification form Plaintiff submitted to UPS, Dr. Quinlan made no mention of "tests" or "evaluations" to be conducted on CS. (Pl.'s Dep. at 188.)

Brown's Denial of Plaintiff's FMLA Leave Request Upon Reconsideration

On June 18, Plaintiff called her supervisor Urquhart to report that her FMLA request had been denied, but that Brown was reconsidering it. (Urquhart Dep. at 33-34.) Urquhart told Plaintiff to "hold tight" while the request was being considered. (*Id.*) Meanwhile, Plaintiff inquired whether there was "another shift that [she could]

-10-

work" that would accommodate her son's needs. (Pl.'s Dep. at 252-53, 286.) She was willing to take "whatever I needed to do since it was starting to be a static [sic] about me leaving for FMLA." (*Id.* at 286.) Plaintiff was "trying to come up with something to still do what I need to do . . . and not jeopardize my job." (*Id.* at 284.) Thus, before the eventual denial of the FMLA leave request, Urquhart was "looking for options for [Plaintiff] with her scheduling because [as she understood it] the morning [shift] became a problem . . . and wasn't working for her." (Urquhart Dep. at 24.) Urquhart was "trying to accommodate [Plaintiff] by finding her a different position." (*Id.* at 24, 40.)

In reconsidering Plaintiff's FMLA request, Brown again reviewed the information on the certification. (Brown Dep. at 101-02.) He also consulted with UPS's in-house legal department, which agreed with him that FMLA leave was not warranted. (*Id.*) On or about June 20, Brown telephoned Plaintiff to tell her the request was again denied. (*Id.* at 108-10.) Plaintiff protested, saying "there must be some mistake," but Brown assured Plaintiff that there was no misunderstanding, "the decision [was] the same," the request was "still denied," and she "needed to talk to [her] manager." (Pl.'s Dep. at 239, 244.)

On June 20, Brown contacted Urquhart to report that the request was still denied, and that she needed to contact Plaintiff about returning to work. (Urquhart Dep. at 24, 26.) On the same day, Urquhart called Plaintiff to tell her that the request was denied, "that she would have to return to work, and that [Urquhart]

-11-

would try to accommodate getting her a different schedule at that point in time." (*Id.* at 24-25, 36-37.) She told Plaintiff, "[C]ome on back, and let's try to . . . get you to a different shift," because Plaintiff "could not work that morning shift." (*Id.* at 37.) At the time, Urquhart had no alternative job shifts available, but if Plaintiff returned to work, a suitable "hub sort" job may have opened "three months down the road" and Urquhart "could have possibly put [Plaintiff] in that position." (*Id.* at 39-40.) Urquhart told Plaintiff, "Come back, and as soon as something opens, we'll move you to a different shift." (*Id.* at 40.)

When Plaintiff learned there "was no other shift" available at the time, she told Urquhart she would continue to remain out of work and "tend to [CS.]" (Pl.'s Dep. at 252, 255 ("[C]aring for my son wasn't an option; that had to be done.").) Plaintiff told Urquhart "she could not work that shift, and she couldn't do it." (Urquhart Dep. at 37.) Urquhart explained to her that, although there were no positions available at the time, "once she came back, we could try to–as soon as there was an opening, we [could] get her moved." (*Id.*) Plaintiff responded, "I can't do it. I can't do this." (*Id.*)

Plaintiff testified in her deposition that Urquhart would "not let [her] report back to work [and] told [her] to go on and attend to [CS], and it will resolve itself; it will work itself out." (Pl.'s Dep. at 242.) Defendant notes that Urquhart had no authority to grant or deny FMLA leave and, thus, could not have authorized Plaintiff's continued absence. (Urquhart Dep. at 22; Brown Dep. at 132.) Moreover, Plaintiff

-12-

agrees that she was working with Urquhart to find a different shift because it was likely that FMLA would be denied. Plaintiff testified that when she learned there were no other shifts immediately available, she made it clear that she would not be returning to work, regardless of whether Brown approved her FMLA request. (*See id.* at 252, 255.)

Plaintiff's Termination

After her conversation with Urquhart on June 20, Plaintiff did not return to work. (Urquhart Dep. at 40.) Plaintiff states that she did not return to work because she was "carrying out the needs that [her] son needed for the FMLA." (Pl.'s Dep. at 243-44.) At some point between June 20 and June 27, Urquhart met with her next level supervisor, Toby Akers, to discuss Plaintiff's return to work and "that we would have to discharge her after three days of not coming to work." (Urquhart Dep. at 42.) On June 27, a letter was sent to Plaintiff's home, stating that she was considered to have "resigned," effective June 23, 2007, from her UPS employment based on her "failure to return to work from an unauthorized leave of absence." (Pl.'s Dep. at 247-48, Ex. 21.)

**STANDARD OF REVIEW**

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the burden of initially coming

-13-

forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination, the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

**DISCUSSION**

Under the FMLA, an eligible employee[4] may take 12 workweeks of leave during any 12-month period to care for the employee's spouse, child, or parent if the spouse, child or parent has a "serious health condition." *See* 29 U.S.C.

---

[4] It is undisputed that Plaintiff qualifies as an "eligible employee" under the FMLA.

§ 2612(a)(1)(C); 29 C.F.R. § 825.112(a)(3).[5]  The FMLA further provides that it is unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]."  29 U.S.C. § 2615(a)(1). Courts commonly refer to claims arising under this provision as "interference" claims. *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546 (4th Cir. 2006).  In support of the motion for summary judgment on Plaintiff's interference claim, Defendant contends that Plaintiff's interference claim fails as a matter of law because she was not entitled to FMLA leave to care for her son CS.  For the following reasons, I agree.

As Defendant notes, Plaintiff has the burden of establishing that CS was afflicted with an FMLA-qualifying condition, i.e., a "serious health condition."  *See Rhoads v. FDIC*, 257 F.3d 373, 384 (4th Cir. 2001).  A "serious health condition" under the FMLA is an "illness, injury, impairment, or physical or mental condition" that involves "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  The FMLA regulations describe various conditions that constitute "serious health conditions" for the purpose of FMLA leave.  Here, the FMLA certification form submitted by Dr. Quinlan indicated that CS's condition qualified as a "serious health condition" under 29 C.F.R. § 825.114(a)(2)(iii), which refers to a period of incapacity

---

[5]  On November 17, 2008, the Department of Labor issued new FMLA regulations that became effective January 16, 2009.  Unless otherwise noted, all citations to FMLA regulations are to the version in effect at the time Plaintiff's claims arose in 2007.  (*See* Appendix to Def.'s Motion, Tab 7.)

or treatment for such incapacity due to a "chronic serious health condition." A "period of incapacity" is defined as an "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor or recovery therefrom." *See id.* § 825.114(a)(2)(I). A "chronic serious health condition" is one that (a) "[r]equires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider"; (b) "[c]ontinues over an extended period of time"; and (c) may "cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)." *Id.* § 825.114(a)(2)(iii).

In opposing Defendant's motion for summary judgment, Plaintiff has presented no evidence that, during the period in which Plaintiff sought to take FMLA leave, CS required periodic visits for treatment by a health care provider continuing over an extended time period. In her response brief, Plaintiff makes the conclusory statement that CS "was too incapacitated to attend school during the summer without therapy sessions and one-on-one care." Plaintiff also makes the sweeping, unsupported conclusion in her response brief that during the summer of 2007, CS was receiving treatment, including examinations to determine if a serious health condition existed. These statements by Plaintiff are simply not supported by the record and are directly contrary to the undisputed evidence that when Plaintiff applied for FMLA leave, CS was receiving no on-going treatment by any healthcare provider and was receiving no such testing. That is, the evidence shows that CS

-16-

had a well-child, check-up appointment with Dr. Quinlan in 2005, and then again in late August 2007, which was more than 2 ½ months after Plaintiff's FMLA request. Both visits were routine physicals, which are excluded from the meaning of "treatment." *See id.* § 825.114(b) (noting that treatment does not include routine physicals). Dr. Quinlan was not monitoring CS's speech therapy from the years 2005 to 2007. Indeed, Dr. Quinlan only knew what had transpired between 2005 and 2007 as a result of Sabo's letter, which Dr. Quinlan relied on to complete the FMLA certification form. Dr. Quinlan was also not monitoring or supervising any of the activities Plaintiff intended to do with CS over the summer.

As to any treatment by CS's speech therapist Sabo, Defendant contends that Sabo does not qualify as a "health care provider" under the FMLA. *See id.* § 825.118 (defining "health care provider").[6] I agree with Defendant that Sabo does not appear to qualify as a "health care provider" under the applicable regulations. In any event, even if Sabo is a "qualified health care provider," Plaintiff has provided

_____

[6] The applicable regulations define a "health care provider" as:

[a] doctor of medicine or osteopathy . . . or [a]ny other person "capable of providing health care services . . . [which] include[s] only . . . podiatrists, dentists, clinical psychologists, optometrists, and chiropractors [that meet certain requirements], [n]urse practitioners, nurse midwives, and clinical social workers [that meet certain requirements]. . .Christian Science practitioners . . ., [and] [a]ny health care provider from whom an employer or the employer's group health plan's benefits manager will accept certification of the existence of a serious health condition to substantiate a claim for benefits.

29 C.F.R. § 825.118.

no evidence that Sabo was providing CS with "continuing treatment" as defined in the FMLA when Plaintiff sought to take FMLA leave. *See id.* § 825.114(b) ("Treatment . . . includes . . . therapy *requiring special equipment* to resolve or alleviate the health condition (e.g., oxygen).") (emphasis added). Finally, as to Nurse Amanda Pone, who periodically monitored CS's progress over the summer of 2007, Plaintiff admitted that Pone was not responsible for testing or evaluating CS, or otherwise providing medical treatment to him. In sum, at the time of Plaintiff's June 2007 FMLA request, CS was not receiving continuing treatment by a qualifying health care provider for a chronic serious health condition. Thus, for this reason alone, Plaintiff was not entitled to FMLA leave.

Defendant further contends on summary judgment that Plaintiff has failed to show that she was "needed to care for" CS during the requested period within the meaning of the FMLA regulations. *See id.* § 825.116. For the following reasons, I agree. The applicable regulations state:

> The medical certification provision that an employee is "needed to care for" a family member encompasses both physical and psychological care. It includes situations where, for example, *because of a serious health condition*, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety, or is unable to transport himself or herself to the doctor, etc. The term also includes providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent *with a serious health condition* who is receiving inpatient or home care.

*Id.* § 825.116(a) (emphases added).

-18-

Here, as the plain language of the regulations indicate, a showing that a child suffers from a serious health condition is a prerequisite to a finding that a parent is "needed to care for" the child. In other words, a plaintiff must show that the child suffers from a serious health condition *and* that the parent is needed to care for the child. As the court has already discussed, Plaintiff has not raised a genuine issue of fact as to whether CS suffered from a serious health condition within the meaning of the FMLA when Plaintiff sought to take FMLA leave. In any event, I agree with Defendant that Plaintiff has also not shown that she was needed to care for CS during the requested FMLA leave period. Here, Plaintiff testified that she interpreted Dr. Quinlan's instructions to be that she needed to "be at home everyday" with CS, "not work[]" at UPS, and conduct the activities suggested by Sabo. (Pl.'s Dep. at 243-44, 251-52.) As Defendant notes, however, Plaintiff has presented no record evidence showing that Dr. Quinlan or Sabo instructed or recommended that Plaintiff should remain at home full time to do activities with her son. First, aside from filling out the certification form, Dr. Quinlan never had a direct conversation with Plaintiff during June 2007 or at any time between CS's last well-check appointment in 2005 and his next appointment in August 2007. (Quinlan Dep. at 24, 34, 39, 43, 44.) Furthermore, Sabo provided no specific guidance as to when, how, how long, or how often the suggested activities should be completed. (Sabo Dep. at 53-55.) Given that Plaintiff's daily work schedule was part-time and was typically 8:30 a.m. to 1:30 p.m., she had the remainder of each day to engage in whatever activities were

-19-

recommended.  Furthermore, Sabo testified that having CS continue in his normal daycare program over the summer would not "preclude [Plaintiff] from being able to do the activities" she suggested.  (*Id.* at 58.)  Sabo also had no "suggestions" or "any input" as to whether CS should be removed from daycare.  (*Id.* at 57-58.)

The facts in this case are similar to those in *Perry v. Jaguar of Troy*, where the plaintiff argued that his son was "incapacitated" because he could not attend a regular day camp because his son "needed extraordinary supervision" due to his attention deficit disorder ("ADD"), attention deficit hyperactivity disorder ("ADHD"), and learning disabilities.  353 F.3d 510, 515-16 (6th Cir. 2003).  The Sixth Circuit affirmed summary judgment for the employer on the plaintiff's FMLA claim, explaining that "[i]n order to have had a serious health condition, whether chronic or permanent, [the child] must have been unable to work, attend school, or perform other regular daily activities during the period of [the parent's] leave."  *Id.* at 515.  The court noted that the evidence showed that the child was able to attend school and engage in daily activities that most children engage in, including riding the bus to and from school, riding bikes, swimming, playing video games, watching television, and playing with others.  As to the plaintiff's contention that the child was incapacitated because he was unable to perform regular daily activities when compared to other children without ADD or ADHD, the Sixth Circuit further observed that "[t]he comparative amount of supervision a child needs standing alone does not address the child's ability to engage in regular daily activities."  *Id.* at 516.

-20-

Here, like the plaintiff in *Perry*, Plaintiff has not shown that when she requested to take FMLA leave, CS was unable to attend his usual daycare program or was otherwise incapacitated in his ability to perform his regular daily activities as a four-year-old boy. As Defendant notes, CS attended regular, 5-day-per-week daycare until June 2007 and was eligible to continue in that same program during the summer–the only difference being that the two weekly, 30-minute speech therapy sessions would be paused for two months. CS's speech therapist Sabo did not believe CS qualified for "extended" therapy over the summer because he "did not have any life-critical skills that . . . needed to be addressed at that time." (Sabo Dep. at 51.) Moreover, after the summer break during which Plaintiff voluntarily pulled him from daycare, CS returned to regular, full-time elementary school in late summer 2007. (*See id.* at 266-67.) In addition, CS was able to do the "physical activities" that were "somewhat typical . . . of other children," had "fine" motor skills, was "able to run [and] jump," was "interacting with his brothers and playing at home," could watch television and movie videos, and "appeared well from playing with toys and trying to do . . . other activities." (Pl.'s Dep. at 219, 220, 223.)

Taking the facts in the light most favorable to Plaintiff, the court assumes that CS's behavior was improved when he received more specialized attention than he was receiving in the summer daycare program from which Plaintiff pulled CS. Indeed, Plaintiff has presented evidence that the daycare teacher in the summer daycare program told Plaintiff that she was not able to give CS specialized attention.

-21-

(*See* Pl.'s Dep. at 227-29.) Plaintiff was obviously concerned about CS's experience in the summer daycare program, and for this reason she pulled him out of the daycare and stayed home with him to give him more personalized attention.  For Plaintiff to be entitled to take FMLA leave, however, Plaintiff must show that CS was incapacitated due to a chronic serious health condition during the time in which she sought to take FMLA leave.  Plaintiff has simply failed to do this because she has failed to show that CS suffered from a serious health condition requiring continued treatment when Plaintiff sought to take FMLA leave.  In sum, because Plaintiff cannot show that her son suffered from a serious health condition, Plaintiff was not entitled to take FMLA leave, and Plaintiff's claim for interference with her FMLA rights fails as a matter of law.

In response to the motion for summary judgment, Plaintiff contends that Defendant is barred from challenging the findings in the medical certification submitted by Dr. Quinlan because Defendant failed to request a second medical opinion before denying Plaintiff's request for FMLA leave.  *See* 29 C.F.R. § 825.307(c).  In support of her argument that failure to request a second medical opinion will bar an employer from challenging the findings in the medical certification, Plaintiff cites to a district court opinion in California, *Sims v. Alameda-Contra Costa Transit Dist.*, 2 F. Supp. 2d 1253, 1264 (N.D. Cal. 1998).  The purported holding of *Sims*, however, is contrary to Fourth Circuit precedent.  The Fourth Circuit held in

-22-

*Rhoads v. FDIC* that an employer does not waive its right to challenge an employee's eligibility for FMLA leave by not seeking a second medical opinion:

> The FMLA provides only that an employer "may" seek a second, or third, opinion if it questions the validity of an employee's proffered medical certification of her condition. *See* 29 U.S.C. § 2613(c)(1), (d)(1); *see also* 29 C.F.R. § 825.307(a), (c) (1993) (relevant regulation using same terminology, i.e., "may"). Because the term "may" is permissive, the plain language of the statute indicates that an employer who questions the validity of a certification has the option of seeking a second and third opinion, without being required to do so. Moreover, the plain language of the Act does not suggest that an employer must pursue these procedures *or* be forever foreclosed from challenging whether an employee suffered from a serious health condition; and nothing in the legislative history of the FMLA explicitly supports that interpretation.

257 F.3d at 385-86 (emphasis in original). *See also Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 580 (6th Cir. 2007) (noting that because the language in 29 U.S.C. § 2613(c)(1) is "merely permissive," an employer that foregoes the right to a second opinion is not thereafter precluded from contesting the validity of an employee's serious health condition).

In her response brief, Plaintiff also contends that Brown simply inserted his own personal opinions about the applicability of FMLA, rather than considering the statement by Dr. Quinlan in the certification form. Here, the evidence shows that Brown compared the submitted information regarding CS against the FMLA definition of "serious health condition" and determined that CS did not suffer from a qualifying condition within the meaning of the FMLA. Brown also consulted with legal counsel about Plaintiff's FMLA request before denying it. Thus, contrary to

-23-

Plaintiff's contention, Brown did not simply insert his personal opinions about the applicability of FMLA as claimed by Plaintiff.

In support of her contention that summary judgment should be denied, Plaintiff also points to the fact that the Department of Labor investigated Plaintiff's termination and found that Defendant had violated her rights by terminating her while out on FMLA leave. *See* 29 C.F.R. § 825.401(a). Plaintiff submitted an Exhibit H that purports to be the findings of a DOL investigator into Plaintiff's FMLA request. (See Pl.'s Ex. H.) Defendant contends that the DOL materials are not admissible because they are unauthenticated, constitute hearsay, and, in any event, do not establish a genuine issue of fact. *See Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993); *Md. Highways Contractors Ass'n, Inc. v. Md.*, 933 F.2d 1246, 1251-52 (4th Cir. 1991).

Here, I find that even if the DOL findings are admissible, the findings do not create a genuine issue of fact such that Plaintiff could avoid summary judgment. This is because the DOL findings merely repeat facts that Plaintiff has alleged here, without noting the source of the evidentiary findings. Furthermore, some of the facts stated in the DOL findings simply contradict the evidence presented before this court. That is, the DOL investigator notes in the report under the heading "Serious Health Condition/Qualifying Event": "Ms. Stroder's four year old son . . . has delays in communication and started obtaining speech therapy in August 2006. He has been seeing a doctor and is getting a batter [sic] of tests trying to rule out autism.

-24-

This is a qualifying event for FMLA." Under the heading "Status of Compliance," the investigator further notes: "[CS's] doctor, Dr. Quinlan, took [Plaintiff] out of work from June 11, 2007, until August 31, 2007, so that she could work with [CS's] communication and speech therapy. Also, [Plaintiff] had to take [CS] to various doctor's appointments for tests ranging from hearing tests to psychological tests."

Here, as Defendant notes, although it is undisputed that CS was later diagnosed with autism, there is simply no evidence in the record that tests for autism were being conducted during the summer in which Plaintiff requested FMLA leave. Indeed, Plaintiff admitted in her deposition that the "first time . . . a healthcare professional . . . used the word 'autism' in describing . . . what they were testing [CS] for" was several months later in Fall 2007. (Pl.'s Dep. at 183.) Moreover, Dr. Quinlan never discussed autism as a possible condition before the August 27, 2007, "well-check" appointment. (Quinlan Dep. at 49.) Before the August well-check appointment, Quinlan had never "conduct[ed] or recommend[ed] testing for autism." (*Id.*) In addition, Sabo "never discussed" with Plaintiff any "traits of autism" allegedly displayed by CS, and never did an "evaluation" to "determine if the symptoms [CS had] were consistent with autism." (Sabo Dep. at 59-60.) Finally, the FMLA certification form made no mention of autism or testing for autism. (Pl.'s Dep. at 187; Quinlan Dep. at 49.) In addition, despite the certification from Dr. Quinlan, there is simply no evidence to show that any healthcare provider stated that Plaintiff was required to be home with CS all day long during the FMLA period to work with [CS's]

-25-

communication and speech therapy. Indeed, Dr. Quinlan's medical opinion relied entirely on the information provided to her by Sabo, and Sabo never stated that Plaintiff needed to pull CS out of his full-time daycare for communication and speech therapy.

In sum, the DOL findings, which were merely a restatement of the facts as alleged by Plaintiff, do not create a genuine issue of fact as to whether CS suffered from a FMLA-qualifying event. *See Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988) (finding that an EEOC report's probable cause finding of discrimination was "not sufficiently probative to create a genuine issue of material fact about [the employer's] intent to discriminate on the basis of age" because the report "merely repeats facts which [the plaintiff] himself alleges elsewhere . . and then states in conclusory fashion that those facts reflect age discrimination"); *see also Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 514 & n.3 (D. Md. 2008) (stating that the findings in a purported Department of Labor report were unauthenticated and therefore inadmissible and, in any event, did not create a genuine issue of fact because "the report merely repeats facts that Plaintiff has alleged in the instant case").

For the reasons stated herein, the court should find that there is no genuine issue of fact as to whether Plaintiff was entitled to FMLA leave in summer 2007. In sum, Plaintiff has not presented evidence to raise an issue of fact as to whether CS

-26-

suffered from an FMLA-qualifying event. Therefore, the court should grant summary judgment in favor of Defendant on Plaintiff's FMLA interference claim.

<u>Plaintiff's Claim for Retaliation in Violation of FMLA</u>

To state a claim of retaliation under the FMLA, "an employee must allege that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1207 (11th Cir. 2001) (applying the *McDonnell Douglas* analysis in a FMLA case). Courts have held that a request for FMLA leave to which an employee was not entitled does not constitute protected activity. *See Walker v. Elmore County Bd. of Educ.*, 379 F.3d 1249, 1253 (11th Cir. 2004) (holding that the plaintiff's FMLA request was not "protected activity" because she was not eligible for requested leave, stating that the FMLA "does not protect an attempt to exercise a right . . . not provided by FMLA"); *Arbia v. Owens-Illinois, Inc.*, No. 1:02cv111, 2003 WL 21297330, at *5 (M.D.N.C. June 4, 2003) ("To establish a prima facie case for retaliatory discharge under the FMLA, an employee must establish that he or she was . . . entitled to FMLA leave.").

Here, because Plaintiff has failed to raise an issue of fact as to her FMLA interference claim, her retaliation claim likewise fails. Plaintiff's retaliation claim is premised on her June 2007 FMLA request, but the undersigned has concluded that Plaintiff was not eligible for FMLA leave under that request. In sum, because Plaintiff was not entitled to the leave she requested, her request was not protected

activity under the FMLA, and she therefore cannot prove a prima facie case of retaliation.[7]  Therefore, the court should grant summary judgment in favor of Defendant on Plaintiff's FMLA retaliation claim.

Plaintiff's Claim for Wrongful Termination in Violation of North Carolina Public Policy

Finally, as for Plaintiff's claim for wrongful discharge in violation of North Carolina public policy, I agree with Defendant that Plaintiff has abandoned this claim because she did not respond to Defendant's summary judgment argument as to this claim.  *See* FED. R. CIV. P. 56(e); *Rogers v. Unitrim Auto & Home Ins. Co.*, 388 F. Supp. 2d 638, 641 (W.D.N.C. 2005) (holding that the plaintiffs' failure to make an argument on a claim in response to the defendants' summary judgment motion constituted an abandonment of that claim).

**CONCLUSION**

For the reasons stated herein, it is **RECOMMENDED** that the court grant Defendant's motion for summary judgment (docket no. 20) and dismiss this case.

_____
WALLACE W. DIXON
United States Magistrate Judge

June 10, 2010

---

[7]  Defendant further contends that Plaintiff also cannot establish the causation element of her prima facie case of FMLA retaliation, but the court need not address the causation aspect because Plaintiff did not engage in protected FMLA activity in the first instance.

-28-