IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

VEDA STRODER                                )
                                            )
                Plaintiff,                  )
                                            )
        v.                                  )        1:09CV335
                                            )
UNITED PARCEL SERVICE, INC.,                )
                                            )
                Defendant.                  )

MEMORANDUM OPINION

This case involves claims by Plaintiff Veda Stroder ("Plaintiff") for violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654. In Count 1, Plaintiff alleges violation of the FMLA by her former employer, Defendant United Parcel Service, Inc., ("Defendant") in denying her request for 10 weeks of Family Medical Leave to care for her autistic son. In Counts 2 and 3, Plaintiff alleges that Defendant discriminated and retaliated against her in violation of the FMLA, in particular by terminating because of her absences related to the care of her son. In Count 4, Plaintiff asserts a claim for wrongful discharge under state law.

This matter is before the Court on a Recommendation of the Magistrate Judge recommending that Defendant's Motion for Summary Judgment be granted. The Recommendation was filed on June 10, 2010, and notice was served on the parties pursuant to 28 U.S.C. § 636(b). Plaintiff filed Objections to the Recommendation. The Court has now reviewed de novo the Objections and the portions of the Recommendation to which objection was made. Having undertaken this review, the Court concludes that there are genuine issues of material fact precluding summary judgment in this case with respect to Plaintiff's claims under

the FMLA, and for the reasons discussed below, Defendant's Motion for Summary Judgment will be denied as to the FMLA claims. However, Plaintiff has not opposed the Motion for Summary Judgment as to her state law wrongful discharge claim (Count 4), and that claim will therefore be dismissed.

## I.    FACTUAL BACKGROUND

Taking the evidence in the light most favorable to the Plaintiff as is required on a Motion for Summary Judgment, the Court notes that in 2007, Plaintiff had been an employee of Defendant UPS for over a year, and on June 8, 2007, Plaintiff requested 10 weeks of Family Medical Leave to care for her son, C.S. Although C.S. had not yet been diagnosed with autism at the time Plaintiff requested Family Medical Leave, he had been diagnosed with a learning disability and speech impairment that required ongoing speech therapy. In addition, Plaintiff testified in her deposition that in the weeks prior to her requesting Family Medical Leave, her son began to experience serious behavioral problems and communication impairments. At that time, C.S. was four years old and in a daycare/preschool class of fifteen students. However, C.S. began to experience behavioral problems and outbursts that included staying under the tables or staying up on the tables, knocking things down in the classroom, refusing to follow directions, refusing to stay in a chair, and refusing to engage in activities. He also began defecating on himself and could not manage his hygiene issues. At daycare, C.S. was displaying "very aggressive behavior." Although C.S. was not expelled from the daycare, the daycare teacher informed Plaintiff of her concerns and told her that they could not give him any special services or provide for C.S.'s specialized needs. C.S.'s speech therapist, Denise Sabo, also told Plaintiff

that C.S. was having a lot of difficulty at the daycare and was regressing in his behavior. Ms. Sabo testified in her deposition that "at that point he was definitely demonstrating some autistic behaviors" and that C.S. would have progressed more in a one-on-one environment rather than the daycare. According to Plaintiff, by June 2007, C.S. would not speak, had become almost mute, and was "going in a hole." Although Plaintiff acknowledges that C.S. did not have any physical disabilities such as an inability to walk or run, Plaintiff contends that C.S. had serious behavioral and developmental issues, including not communicating, panicking when out in public, high sensory overload, and staying "in some kind of trance" when they were in crowds. C.S. also continued to experience serious behavioral problems and hygiene issues at daycare. Plaintiff contends that based on these issues, she needed to take C.S. out of daycare and care for him at home for ten weeks until he could begin a special needs program available through the school system.

C.S.'s pediatrician, Dr. Quinlan, had previously noted C.S.'s communication delays and had referred him for additional services and evaluation through the Greensboro Children's Developmental Services Agency. C.S. began receiving services and evaluation through this agency beginning in 2005. Following his increasing behavioral problems in 2007, Plaintiff was provided additional referrals for evaluation through another Social Service Department, the North Carolina Child Service Coordination program, as well as a program through the University of North Carolina Greensboro (UNCG). These referrals came either from Dr. Quinlan's office or from the Children's Developmental Services Agency where C.S. was originally referred by Dr. Quinlan's office. These additional referrals included evaluation for 2

hours every 2 weeks by nurse Amanda Pone. Although Nurse Pone was not directly supervised by Dr. Quinlan, she was, according to Plaintiff, part of the Social Service Agency that evaluated C.S.'s behavior in order to determine the appropriate diagnosis and need for services. According to Plaintiff, these 2-hour evaluations by Nurse Pone occurred during the summer of 2007. According to Plaintiff, Nurse Pone watched C.S., had him draw and color, and watched his behavior. Plaintiff also discussed with Nurse Pone what they were doing at home so that Nurse Pone could assess C.S. and his progress during that time. During that summer, Plaintiff contends that she also submitted questionnaires to UNCG as part of the program for obtaining a psychological evaluation of C.S., but she had to wait for an appointment in that program. Dr. Quinlan's office also scheduled an appointment for C.S. to rule out other potential issues such as hearing loss. The appointment with Dr. Quinlan took place in August 2007, and according to Plaintiff, at that appointment Dr. Quinlan indicated the likelihood of autism and provided Plaintiff with additional referrals for further evaluation and services. C.S. began school in a special needs pre-kindergarten class in August 2007, which was available to him due to his disability. As part of that program, C.S. was further tested and evaluated and was ultimately diagnosed with autism.

In late May 2007, after C.S.'s behavioral problems intensified but before the summer appointments took place, Plaintiff relayed information to her supervisor, Donna Urquhart, regarding C.S.'s increasing behavioral problems and developmental delays and his inability to receive specialized care until he could begin the special needs program in the fall. As a result, Ms. Urquhart encouraged Plaintiff to pursue Family Medical Leave. Prior to Plaintiff submitting

a formal FMLA request, Ms. Urquhart authorized Plaintiff's absences, and Plaintiff took C.S. out of the daycare program and began caring for him at home. Plaintiff then submitted to the Human Resources Department an FMLA leave request and a medical certification from C.S.'s pediatrician, Dr. Quinlan. The medical certification submitted by Dr. Quinlan in support of Plaintiff's request for Family Medical Leave indicated the C.S. had a "chronic serious health condition" based on "very significant delays in communication," and that this condition had commenced in 2005. The certification from Dr. Quinlan stated that it would be necessary for Plaintiff to be absent from work as a result of C.S.'s condition because C.S. required assistance for basic medical or personal needs or safety, and because Plaintiff's presence to provide psychological comfort to C.S. would be beneficial to assist in C.S.'s recovery. With respect to the specific treatments, the certification focused on C.S.'s need for ongoing speech therapy over the next two to three years, with treatment provided by a speech therapist or by Plaintiff when speech therapy was not available. Although Dr. Quinlan had previously diagnosed C.S. with developmental delays and a speech impairment, Dr. Quinlan had not examined C.S. recently and therefore the certification was based on Dr. Quinlan's review of a more recent assessment by C.S.'s speech therapist. This assessment from the speech therapist was based on testing of C.S. in March 2007 before his behavioral problems intensified in May 2007, but the assessment did note C.S. was recently experiencing "more difficulty following directions and attending to activities in therapy" and that C.S. was "easily frustrated." The certification completed by Dr. Quinlan likewise focused on C.S.'s speech delays, and did not address C.S.'s increasing behavioral problems. However, Plaintiff maintains that she had provided all of the additional

information regarding C.S.'s behavioral and developmental problems to her supervisor, Ms. Urquhart, including specifically mentioning that C.S. might have autism.

A few days after the request was submitted, Plaintiff's request for FMLA leave was denied by Human Resources Occupational Health Supervisor, Ralph L. Brown, Jr., based on his conclusion that C.S.'s speech delays and need for speech therapy did not constitute a "serious health condition." Plaintiff contends that her supervisor, Ms. Urquhart, told her there must be a misunderstanding and to "hold tight." Plaintiff contends that she subsequently telephoned Brown and explained all of C.S.'s behavioral and developmental problems, including that C.S. was being evaluated for autism as well as hearing loss. Plaintiff contends that she explained to Brown that C.S. had "traits of autism, serious speech delays, mental delays." In her affidavit, Plaintiff states that she told Brown about C.S.'s "inability to communicate verbally, physical and mental inabilities, suspected hearing impairments, . . . inability to receive specialized care at daycare . . . [and] that [C.S.] could not provide for his hygiene issues as most four (4) year olds could." Plaintiff contends that she advised Brown that these issues were "exteremely debilitating for [C.S.] and required specialized, one on one care." Brown agreed to reconsider his decision. However, Brown did not ask for additional medical certification or information regarding C.S.'s behavioral problems, autistic behavior, and developmental delays. Brown subsequently called Plaintiff to inform her that the decision was still the same. In its Answer, Defendant admits that during Plaintiff's conversation with Brown, Plaintiff told Brown that she had removed C.S. from daycare. However, Brown denies that Plaintiff told him of C.S.'s additional behavioral issues or delays, and denies that Plaintiff mentioned the possibility of autism. Nevertheless, on a

Motion for Summary Judgment, the Court must consider the evidence in the light most favorable to Plaintiff. Therefore, for purposes of this Motion, the Court accepts Plaintiff's contention that she informed Brown of all of C.S.'s additional issues in greater detail during her telephone call requesting reconsideration. A week later, Defendant sent Plaintiff a letter noting that she was considered to have resigned based on her failure to return to work.

## II. LEGAL STANDARDS UNDER THE FAMILY MEDICAL LEAVE ACT

"The FMLA is intended to balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions and compelling family reasons." Rhoads v. Federal Deposit Insurance Corp., 257 F.3d 373, 381 (4th Cir. 2001) (internal quotations omitted). The FMLA was enacted "[i]n recognition of the growth of 'single-parent households and two-parent households in which the single parent or both parents work,' the importance of parental participation 'in early childrearing' and 'care of family members who have serious health conditions,' the inadequacy of 'employment policies to accommodate working parents,' and the lack of 'job security for employees who have serious health conditions.'" Yashenko v. Harrah's NC Casino Company, LLC, 446 F.3d 541, 545-46 (4th Cir. 2006) (quoting 29 U.S.C. § 2601). Under the FMLA, an eligible employee is entitled to 12 weeks of unpaid leave during any 12-month period for certain purposes, including "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612.[1] The FMLA requires that employees taking such leave

---

[1] An "eligible employee" is one who has been employed "for at least 12 months by the employer . . . for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611. The Court notes that there is no contention in this case that

be restored to their same or an equivalent position upon returning to work.  29 U.S.C. § 2614.

Under the FMLA, an employer may not interfere with an employee's exercise of this right, nor may an employer discriminate against an employee for exercising or attempting to exercise this right.  29 U.S.C. § 2615.  "Interference" with FMLA rights includes refusing to allow qualified FMLA leave, and an employer is liable on an "interference" claim if the employer denies FMLA leave that should have been allowed.  See 29 C.F.R. § 825.220; Strickland v. Water Works & Sewer Board of City of Birmingham, 239 F.3d 1199, 1206-07 (11th Cir. 2001) (noting that "[t]o state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied"); Yashenko, 446 F.3d at 546 (noting that an "interference" claim under the FMLA arises based on alleged violation of the *prescriptive* rights under the Act, which set "substantive floors for conduct by employers, and creat[e] entitlements for employees" (internal quotation omitted)); Blankenship v. Buchanan General Hospital, 140 F. Supp. 2d 668, 673 (W.D. Va. 2001).  The separate prohibition against "retaliation" under the FMLA prohibits employers from discharging an employee or otherwise discriminating against an employee for exercising his or her rights under the FMLA.  See 29 U.S.C. § 2615; 29 C.F.R. § 825.220; Yashenko, 446 F.3d at 546 (noting that a retaliation claim under the FMLA arises based on alleged violation of the *proscriptive* provisions under the Act, which protect employees from discrimination or retaliation for exercising their rights under the Act).

In a suit alleging violation of the FMLA, the burden is on the Plaintiff to prove the

Plaintiff was not an "eligible employee" under the FMLA.

8

existence of an FMLA-qualifying condition, because otherwise the employee would not "have any right under the Act with which her employer could have interfered." Rhoads, 257 F.3d at 384. As noted above, the FMLA includes leave by an employee in order to care for the child of the employee if the child has a serious health condition. Under the FMLA regulations, a "serious health condition" includes an illness, impairment, or physical or mental condition that involves "continuing treatment by a health care provider." 29 C.F.R. 825.114.[2] This would include, inter alia, "any period of incapacity" due to a "chronic serious health condition" or "a period of incapacity" which is "permanent or long-term due to a condition for which treatment may not be effective." 29 C.F.R. § 825.114. A "period of incapacity" includes inability to "attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom." 29 C.F.R. § 825.114. A "chronic serious health condition" is one which (1) requires periodic visits[3] for treatment by a health care provider or a nurse under direct supervision of a health care provider; (2) continues over an extended period of time; and (3) may cause either episodic or continuing periods of incapacity. 29 C.F.R. § 825.114. "Treatment" includes "examinations to determine if a serious health condition exists and evaluations of the condition." 29 C.F.R. § 825.114. In addition, a "health care provider" includes nurse practitioners and clinical social workers who are authorized to practice under

---

[2] The regulations cited are the regulations in effect in 2007. The regulations were revised effective January 16, 2009, but all references to the regulations are the 2007 version in effect at the time of the incidents involved in this case, although some variations contained in the 2009 version of the regulations are noted in the footnotes.

[3] The regulations in effect in 2007 did not define "periodic visits," but the current version of the regulations provides for "periodic visits (defined as at least twice a year)." 29 C.F.R. § 825.115 (2009).

State law and who are performing within the scope of their practice under State law. 29 C.F.R. § 825.118. Thus, under these regulations, a "serious health condition" includes any period of incapacity (an inability to attend school or inability to perform other regular activities) due to a chronic condition, and the condition must have continued over an extended period of time and must have required "periodic visits" for treatment or evaluation with a doctor, nurse practitioner, or clinical social worker, or a nurse under the direct supervision of a doctor, nurse practitioner or clinical social worker. However, treatment need not have taken place during the leave, since "[a]bsences attributable to incapacity . . . qualify for FMLA leave even though the employee or the immediate family member does not receive treatment from a health care provider during the absence." 29 C.F.R. § 825.114(e). Whether an employee is "needed to care for" a family member "encompasses both physical and psychological care. It includes situations where, for example, because of a serious health condition, the family member is unable to care for his or her own basic medical, hygienic, or nutritional needs or safety . . . The term also includes providing psychological comfort and reassurance which would be beneficial to a child, spouse or parent with a serious health condition who is receiving inpatient or home care. . . . The term also includes situations where the employee may be needed to fill in for others who are caring for the family member, or to make arrangements for changes in care." 29 C.F.R. § 825.116.

Employees requesting leave for FMLA reasons must provide notice to the employer as soon as practicable. 29 C.F.R. § 825.302, § 825.303. In providing this notice with respect to foreseeable leave, "[a]n employee shall provide at least verbal notice sufficient to make the

employer aware that the employee needs FMLA-qualifying leave. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed . . . The employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken. In the case of medical conditions, the employer may find it necessary to inquire further to determine if the leave is because of a serious health condition and may request medical certification to support the need for such leave." 29 C.F.R. § 825.302; see also 29 C.F.R. § 825.303 (noting that for unforseeable leave, "[t]he employer will be expected to obtain any additional required information through informal means."). Thus, once the employee requests leave, the burden shifts to the employer, and the "employer should inquire further to ascertain whether it is FMLA leave that is being sought and to obtain further details of this leave." Rhoads, 257 F.3d at 383; Dotson v. Pfizer, Inc., 558 F.3d 284, 295 (4th Cir. 2009). An employer may require that the employee submit a certification from a health care provider to support the requested leave. 29 U.S.C. § 2613; 29 C.F.R. 825.305. "This certification 'shall be sufficient' if it articulates: the date on which the serious health condition commenced; its probable duration; the 'appropriate medical facts,' within the health care provider's knowledge, regarding this condition; and a statement" that the employee is "needed to care for the son, daughter, spouse or parent and an estimate of the amount of time that such employee is needed to care for the son, daughter, spouse or parent." Rhoads, 257 F.3d at 383; 29 U.S.C. § 2613. If an employee submits a medical certification that the employer views as incomplete, the employer "shall advise" the employee of this belief and "provide the employee

a reasonable opportunity to cure any such deficiency. 29 C.F.R. § 825.305; Rhoads, 257 F.3d at 383.[4] In addition, "a health care provider representing the employer may contact the employee's health care provider, with the employee's permission, for the purposes of clarification and authenticity of the medical certification." 29 C.F.R. § 825.307.

"An employer who has reason to doubt the validity of a medical certification may require the employee to obtain a second opinion at the employer's expense," but the health care provider providing the second opinion "may not be employed on a regular basis by the employer." 29 C.F.R. § 825.307; 29 U.S.C. § 2613. If the employer does not obtain a second opinion at the time of the FMLA leave request, the employer may still later challenge whether the employee or family member had a "serious health condition," and such a challenge leaves for the jury the determination of whether the leave was needed for a "serious health condition." Rhoads, 257 F.3d at 386.

III. ANALYSIS

In the Recommended Decision in this case, the Magistrate Judge concluded that summary judgment should be granted on all of Plaintiff's FMLA claims because Plaintiff had

---

[4] Under the current version of the regulations, an employer must inform the employee in writing if the certification is incomplete or insufficient and what additional information is necessary to make the certification complete and sufficient. 29 C.F.R. § 825.305 (2009). Under the current regulations, "[a] certification is considered insufficient if the employer receives a complete certification, but the information provided is vague, ambiguous, or non-responsive," and in these circumstances the employer must provide the employee with at least seven calendar days to cure any such deficiency by providing a resubmitted certification. Id. These regulations were not in effect in 2007, but they are consistent with the previous requirement that was in effect, which provided that the employer must advise the employee of any deficiency in the certification and provide the employee a reasonable opportunity to cure the deficiency.

shown no genuine issue of material fact with respect to whether her son, C.S., had a "serious health condition" and whether she "needed to care for" her son under the applicable FMLA regulations. In considering these issues, the Court notes that the analysis of Plaintiff's FMLA claim involves two separate issues: first, was Plaintiff entitled to leave under the FMLA to care for a child with a "serious health condition," and second, was Defendant provided with sufficient notice of this serious health condition, since an employer only violates the FMLA if the employer has sufficient notice of the serious health condition and still denies the requested leave. With respect to the first question, whether Plaintiff was entitled to leave under the FMLA, the burden is on Plaintiff to establish that C.S. was suffering from a serious health condition. See Rhoads, 257 F.3d at 381. In its Motion for Summary Judgment, Defendant does not contend that autism is not a serious health condition.[5] Defendant also does not dispute that Plaintiff's son, C.S., does in fact suffer from autism. However, Defendant contends that at the time of Plaintiff's FMLA request, (1) C.S. had not suffered from any period of incapacity, that is, inability to "attend school or perform other regular daily activities due to the serious health

---

[5] Indeed, courts generally assume that autism is covered under the FMLA without much discussion. See, e.g., Williams v. Potter, 2010 WL 1245835 (D. Md. March 25, 2010) ("Williams is the sole provider for her eight-year-old daughter, who suffers from epilepsy and autism, and who thus is covered under the FMLA"); Mayhew v. T-Mobile USA, Inc., 2009 WL 5125642 (D. Ore. Dec. 22, 2009) (noting that the plaintiff had been granted FMLA leave for absences related to her son's autism); Dramer v. Exxon Mobil Corp., 2009 WL 1544690 (D.N.J. June 3, 2009) (noting that the Plaintiff took FMLA leave to care for his son who had autism); Derrick v. Metropolitan Government of Nashville and Davidson County, 2007 WL 4468673 (M.D. Tenn. December 17, 2007) (noting that there was no dispute that Plaintiff was entitled to take FMLA leave to care for her autistic son); Shtab v. Greate Bay Hotel & Casino, Inc., 173 F. Supp. 2d 255 (D.N.J. 2001) (noting that there was no dispute that the plaintiff's son, who had been diagnosed with autism, suffered from a serious health condition as defined by the FMLA).

condition"; (2) C.S. was not receiving treatment from a health care provider; and (3) Plaintiff could not show that she was "needed to care for" C.S. as a result of his serious health condition. The Court will consider each of these contentions in turn.

With respect to whether C.S. suffered from a "period of incapacity," Defendant contends that C.S. could still attend daycare and perform regular activities and that C.S. needed only an hour of speech therapy each week that Plaintiff could provide during non-work hours. However, this contention fails to take the facts in the light most favorable to Plaintiff. Plaintiff, for her part, contends that due to C.S.'s developmental delays and increasing behavioral problems, C.S. was unable to participate in the regular daycare/preschool program because he stayed under the table, refused to participate, and became very aggressive as a result of his disability. He also began defecating on himself and could not manage his own hygiene issues. Although he had not been expelled from the school, the teacher had informed Plaintiff that they could not meet his specialized needs. In addition, Plaintiff also indicated that C.S. experienced other autistic behaviors including "going in a trance" and high sensory overload that prevented them from taking C.S. out in public or in crowds. Finally, Plaintiff stated that by June 2007, C.S. was no longer speaking and had become almost mute. Therefore, in light of this evidence, the Court concludes that there is a genuine issue of fact regarding whether C.S. experienced a period of incapacity based on an inability to attend school/daycare or perform other regular activities due to what was later diagnosed as autism.[6]

---

[6] The Court notes that "all of the circuit courts of appeals to address the question . . . have held that lay testimony can create a genuine issue of material fact regarding incapacitation" either alone or as a supplement to medical evidence. See Schaar v. Lehigh Valley Health

With respect to whether C.S. was receiving periodic treatment or evaluation from a health care provider, there is no dispute C.S. had been receiving services through the Greensboro Children's Developmental Services Agency since 2005. However, Defendant contends that C.S. was not receiving periodic treatment or evaluation because speech therapy should not be considered a treatment by a health care provider, and because C.S. was receiving only "well child" checks by his pediatrician. However, Plaintiff contends that in addition to the speech therapy services and evaluation through Greensboro Children's Developmental Services Agency, after C.S.'s behavioral problems increased in May 2007, she contacted the pediatrician's office for appointments to check C.S.'s hearing and delays, and also began the process of making other appointments through other social services agencies. In addition, Plaintiff contends that as part of this process, C.S. was evaluated bi-weekly by Nurse Pone, who was associated with a social service agency referred by C.S.'s pediatrician as part of the process for determining a proper diagnosis and providing him with further services and testing. Defendant contends that Plaintiff has "admitted" that Nurse Pone was not responsible for testing or evaluating C.S. or for otherwise providing medical treatment to him. However, Plaintiff in her deposition stated

Services, Inc., 598 F.3d 156, 159 (3d Cir. 2010). In addition, the Court notes that the FMLA would include leave related to "symptoms that are eventually diagnosed as constituting a serious health condition, even if, at the time of the initial medical appointments, the illness has not yet been diagnosed nor its degree of seriousness determined" since "[i]t seems unlikely that Congress intended to punish people who are unlucky enough to develop new diseases, or to suffer serious symptoms for some period of time before the medical profession is able to diagnose the cause of the problem." Hodgens v. General Dynamics Corp., 144 F.3d 151, 163 (1st Cir. 1998); see also Krenzke v. Alexandria Motor Cars, Inc., 289 Fed. Appx. 629, 634 (4th Cir. 2008) (noting that "the framework created by the FMLA and its accompanying regulations focus on the impact of the symptoms and the scope of the treatment, not just the diagnosis which is eventually made").

that Nurse Pone was evaluating C.S. and monitoring and documenting his progress as part of the referral from the Social Services Agency. Plaintiff stated that Nurse Pone's observations were ultimately provided to the doctors. Plaintiff's speech therapist, Denise Sabo, noted that a diagnosis of autism is made by a team of professionals based on extended observations of the child that are provided to a psychologist who makes the diagnosis. Therefore, taking the evidence in the light most favorable to Plaintiff, there is evidence to establish that C.S. was receiving bi-weekly visits from Nurse Pone to evaluate his condition, particularly his behavioral and developmental delays, in order to assist in diagnosing his condition. Therefore, the Court concludes that there is at least a genuine issue of material fact regarding whether C.S. was receiving periodic treatments or evaluations by a health care provider or a nurse under the supervision of a health care provider, which would include a doctor, nurse practitioner, or clinical social worker.

Finally, with respect to whether Plaintiff was "needed to care" for C.S., Defendant contends that the only "care" provided by Plaintiff was speech therapy to replace the twice-weekly speech therapy that had previously been provided during the regular school year, which could have been accomplished outside of work hours. However, this contention again focuses solely on the speech therapy under Defendant's view of the evidence, without considering the additional evidence presented by Plaintiff regarding C.S.'s autistic behavior and special needs that could not be met in the regular preschool/daycare. The FMLA includes leave for physical and psychological care, and specifically includes "situations where the employee may be needed to fill in for others who are caring for the family member, or to make arrangements for changes

in care." Plaintiff contends that she requested leave for 10 weeks to care for C.S. in light of C.S.'s inability to continue in regular daycare based on his developmental and behavioral delays, until C.S. could begin receiving specialized care in a special needs pre-kindergarten program available to him through the school system as a result of his disability. There is no question that C.S. was, in fact, suffering from autism at the time, although the diagnosis had not yet been made and further evaluation was needed. In these circumstances, the Court notes that there is a genuine issue of material fact regarding whether Plaintiff was "needed to care" for C.S. as a result of a serious health condition under the applicable regulations.

In all of its contentions, Defendant focuses only on C.S.'s speech delay and need for limited speech therapy. In this regard, Defendant contends that Brown denied Plaintiff's requested FMLA leave because the need for speech therapy was not a "serious health condition" requiring full time leave. However, as discussed above, Plaintiff has presented evidence of a "serious health condition" beyond the speech therapy issues noted by Defendant. Therefore, in these circumstances, the Court cannot conclude as a matter of law that C.S. was not suffering from a "serious health condition" under the FMLA, and instead this will be an issue for the jury to resolve.

Defendant further contends that Brown was not informed of any of the additional issues regarding C.S.'s behavioral problems and potential autism diagnosis. As noted above, in addition to establishing that C.S. was in fact suffering from a "serious health condition," Plaintiff must also establish that she provided sufficient notice to Defendant regarding her need for FMLA leave. However, in this case, Plaintiff has testified that she did inform Brown, as well as her

supervisor, Ms. Urquhart, of all of C.S.'s behavioral and developmental issues, including the potential of autism. Given these conflicting accounts, the Court concludes there is a genuine issue of fact regarding whether Brown was presented with all of the relevant information when he made the decision to deny Plaintiff's request for reconsideration.

Moreover, to the extent Plaintiff may have presented Brown with additional information that went beyond the information set out in the medical certification, or that rendered the medical certification ambiguous regarding the extent of C.S.'s issues, Brown could have requested additional information and certification from Plaintiff. Indeed, under the applicable regulations, to the extent the medical certification was viewed as incomplete, Brown was required to provide Plaintiff with notice of the deficiency and a reasonable opportunity to cure the deficiency. 29 C.F.R. § 825.305; Miller v. AT&T Corp., 250 F.3d 820, 836 (4th Cir. 2001) (concluding that when the defendant alleged that the plaintiff's medical certification was inadequate, the plaintiff should not be taken to task for failing to provide information that the defendant had failed to request, since "to the extent it viewed [plaintiff's] certification as incomplete, [defendant] was required to provide [plaintiff] a reasonable opportunity to cure any deficiency"). For its part, Defendant notes that Brown was not required to obtain a second opinion to refute Plaintiff's medical certification. See Rhoads, 257 F.3d at 386. In this regard, the Court agrees that Defendant was not required to obtain a second opinion, and Defendant is free to challenge whether C.S. was in fact suffering from a "serious health condition," regardless of whether Defendant obtained a second opinion at the time of the FMLA request. However, the Fourth Circuit in Rhoads found that such a challenge leaves for the jury the

determination of whether the leave was needed for a "serious health condition," and the Fourth Circuit further noted that there are "potential pitfalls for an employer who chooses not to pursue a second opinion." See Rhoads, 257 F.3d at 386. In this regard, the FMLA is not designed to reward employers who avoid obtaining further information or certification where needed. Cf. Dotson, 558 F.3d at 295 (holding that an employer's "own failure to determine whether leave should be designated as FMLA-protected" may not shield the employer from liability because the court "decline[d] to allow an employer to take advantage of its own lapse in such a way"); Miller, 250 F.3d at 836. Under the regulatory scheme established for the FMLA, Plaintiff must have provided the requisite notice, but Defendant was not entitled to disregard the information presented by Plaintiff, and was obligated to inform Plaintiff of the need for additional information if the medical certification was incomplete. Given the dispute regarding what information was in fact presented by Plaintiff, including in her verbal conversations with Brown and with her supervisor, Ms. Urquhart, the Court finds that there are genuine issues of material fact for trial with respect to the sufficiency of the notice provided by Plaintiff. Therefore, Defendant is not entitled to summary judgment on this issue.

Finally, the Court notes that in addition to Count 1 for "interference" with her rights under the FMLA, Plaintiff also brings claims for retaliation and discrimination in violation of the FMLA. "FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green." Yashenko, 446 F.3d at 550-51. As part of Plaintiff's prima facie case for discrimination or retaliation, Plaintiff must establish that she engaged in a protected activity

under the FMLA, that Defendant took adverse action against her; and that the adverse action was causally connected to her protected activity. See Yashenko, 446 F.3d at 551. In its Motion for Summary Judgment as to these claims, Defendant contends first that Plaintiff cannot establish that she engaged in a protected activity under the FMLA because she cannot establish that she was entitled to FMLA leave. However, there is no question that Plaintiff requested FMLA leave, and as discussed above, the Court finds that there are genuine issues of material fact regarding whether Plaintiff was entitled to take the requested FMLA leave. Therefore, the Court cannot conclude as a matter of law that Plaintiff did not engage in any protected activity under the FMLA. Defendant also contends that Plaintiff cannot establish that her termination was "causally connected" to a protected activity. However, Defendant concedes that Plaintiff was terminated for remaining out of work after her leave was denied. Therefore, although her termination may not have been in retaliation for requesting leave, there is no dispute that she was terminated for taking leave. Under the FMLA, terminating an employee for taking FMLA-protected leave is sufficient to establish a retaliation claim. See Dotson v. Pfizer, Inc., 558 F.3d 284 (4th Cir. 2009); Blankenship, 140 F. Supp. 2d at 672 (collecting cases regarding FMLA retaliatory discharge claims). Although there is dispute regarding whether Plaintiff's leave was "FMLA-protected," the resolution of that dispute will be for the jury, as discussed above. Likewise, to the extent Defendant contends that it can establish a "legitimate, non-discriminatory" reason for terminating Plaintiff because she was terminated for remaining out of work after her leave was denied, that reason is only "legitimate" if Plaintiff was not entitled to FMLA leave. Because that question is for the jury, given the genuine issues of material fact

that remain, the FMLA retaliation claim is not properly resolved on summary judgment. Therefore, the Court declines to adopt the Recommendation, and for the reasons noted herein, the Court concludes that there are genuine issues of material fact for trial and Defendant's Motion for Summary Judgment will be denied with respect to Plaintiff's FMLA claims.

However, the Court notes that Plaintiff did not respond to Defendant's Motion for Summary Judgment with respect to Plaintiff's parallel claim for wrongful discharge under state law. The Recommendation therefore concluded that Plaintiff's state law wrongful discharge claim had been abandoned, and Plaintiff has not raised any Objection to that portion of the Recommendation. See Fed. R. Civ. P. 56(e); Rogers v. Unitrim Auto & Home Ins. Co., 388 F. Supp. 2d 638, 641 (W.D.N.C. 2005). Therefore, Plaintiff's state law claims for wrongful discharge will be considered abandoned and will be dismissed.

For the reasons discussed above, the Court will enter an Order contemporaneously herewith denying Defendant's Motion for Summary Judgment with respect to Plaintiff's claims under the Family Medical Leave Act (Counts 1-3), but granting Defendant's Motion for Summary Judgment with respect to Plaintiff's claim for wrongful discharge under state law (Count 4). This matter will proceed to trial with respect to Counts 1-3 under the Family Medical Leave Act.

This, the 30th day of August, 2010.

United States District Judge